# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DISHODA ROZLKOVA,<br><br>Defendant. | No. 25-mj-1318-GBW |

## UNITED STATES' NOTICE OF APPEAL AND OBJECTION TO MAGISTRATE JUDGE'S ORDER OF DISMISSAL

The United States of America, by and through undersigned counsel, respectfully objects to the May 19, 2025 order issued by the Honorable Gregory B. Wormuth, Chief United States Magistrate Judge, dismissing charges under 50 U.S.C. § 797 and 18 U.S.C. § 1382 in the above-captioned case. For the reasons that follow, this Court should overrule that order and reinstate the dismissed charges.[1]

## INTRODUCTION

In 1907, President Theodore Roosevelt determined that it was "necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved … as a protection against the smuggling of goods between the United States and said Republic." 35 Stat. 2136. For more than a century, the resulting "Roosevelt Reservation" has served as a defensive bulwark against the unlawful trafficking of persons and contraband into the United States.

---

[1] Pursuant to Local Rule of Criminal Procedure, the page limitation for an appeal to the district court is twenty pages. Given the complexity of the issues argued herein, the Government respectfully requests leave to exceed the page limitation by five pages.

The President of the United States has now assessed that "[o]ur Southern border is under attack from a variety of threats" and "[t]he complexity of the current situation requires that our military take a more direct role in securing our southern border than in the recent past." The White House, *Military Mission for Sealing the Southern Border of the United States and Repelling Invasions* (Apr. 11, 2025). Accordingly, in April, the President directed the Department of the Interior to transfer the Roosevelt Reservation to the Department of Defense, which has now incorporated it—as the New Mexico National Defense Area (NMNDA)—into the U.S. Army Fort Huachuca installation. *Ibid.*

That action has legal consequences. Unsurprisingly, persons are not free to enter a U.S. Army installation without authorization. Equally unsurprisingly, doing so with culpable intent exposes the trespassers to criminal liability. Congress has enacted multiple statutes safeguarding the physical integrity of military areas and punishing those who would breach it. *See, e.g.*, 50 U.S.C. § 797 (subjecting to misdemeanor penalties "[w]hoever willfully violates any defense property security regulation"); 18 U.S.C. § 1382 (subjecting to misdemeanor penalties "[w]hoever … goes upon any military … installation, for any purpose prohibited by law").

Dishoda Rozlkova—an alien who entered both the United States and the NMNDA without authorization—argues that she did not violate these laws because she was not aware of the NMNDA's reassignment to the Department of Defense or the area's resulting status. That claim should have been rejected.

*First*, "willful[ness]," as used in Section 797, requires only that the defendant have acted with a culpable purpose—not awareness of the specific reason his or her conduct is proscribed. Here, Rozlkova necessarily acted with such a purpose by crossing into the United States in deliberate contravention of law. She therefore acted "willfully." *See Bryan v. United States*, 524 U.S. 184, 191-93 (1998).

*Second*, entry into the United States without inspection fits comfortably within the capacious phrase "any purpose prohibited by law" so as to satisfy Section 1382.

*Third*, no reason exists to impose a heightened *mens rea* beyond those enacted in Sections 797 and 1382. By restricting liability to willful acts for unlawful purposes, Congress has obviated any risk of ensnaring unsuspecting innocents. Aliens who enter the country without authorization—like others who violate regulations with a culpable intent or for an illegal purpose—do not warrant the protection of an atextual standard.

The Magistrate Judge, however, concluded that no probable cause exists to charge Rozlkova because her intent to enter the country unlawfully was not a sufficiently culpable mindset under Sections 797 and 1382. That was error.

## LEGAL STANDARD

A charging instrument is generally "sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997). "Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006); *see also United States v. DeLeon*, 287 F. Supp. 3d 1175, 1184-85 (D.N.M. 2017) ("The Federal Rules of Criminal Procedure contain no analogue to summary judgment under rule 56 of the Federal Rules of Civil Procedure, so the United States does not need to provide pretrial evidentiary support for the Indictment.").

## BACKGROUND

1.     "The Armed Forces of the United States have played a long and well-established role in securing our borders against threats of invasion, against unlawful forays by foreign nationals into the United States, and against other transnational criminal activities that violate our laws and threaten

the peace, harmony, and tranquility of the Nation." Exec. Order 14,167, 90 Fed. Reg. 8613, 8613 (Jan. 20, 2025). It thus has been and remains "the policy of the United States to ensure that the Armed Forces of the United States prioritize the protection of the sovereignty and territorial integrity of the United States along our national borders." *Ibid.*

In 1916, following cross-Border raids by Pancho Villa into New Mexico and Arizona, "the entire National Guard, more than 150,000 strong, was federalized for a year and stationed along the 2,000 mile Mexican border in California, Arizona, New Mexico, and Texas." Nat'l Guard, *Operation Jump Start*, https://www.nationalguard.mil/Resources/Image-Gallery/Historical-Paintings/Heritage-Series/Jump-Start/. In more recent times, "[t]he United States has used military bases ... to house large groups of immigrants and refugees." Cong. Research Serv., *History of Use of U.S. Military Bases to House Immigrants and Refugees* (July 26, 2018). And Presidents of both parties have continued to activate the military to maintain control of the Border. *See, e.g.*, *Operation Jump Start*, *supra* (two-year border operation by National Guard on President Bush's orders); U.S. Army, *Army National Guard Operation Phalanx*, https://www.army.mil/article/56819/army_national_guard_operation_phalanx ("successor operation to Operation Jump Start" on President Obama's orders).

2.     The President, whose Article II authority includes foreign affairs and command of the Armed Forces, has observed that "[o]ver the last 4 years, the United States has endured a large-scale invasion at an unprecedented level." The White House, *Securing Our Borders* (Jan. 20, 2025). He has further determined that among the millions of aliens who have entered the country without authorization or inspection are "potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent." *Ibid.* Indeed, "[c]artels [now] control vast territories just south of our southern border, effectively controlling who can and cannot travel to the United States from Mexico." The White House, *Declaring a National Emergency at the Southern Border of the United States* (Jan. 20, 2025). And they have exercised

that control to ensure that not only unauthorized persons but also "[d]eadly narcotics and other illicit materials have flowed across the border," creating "substantial risks to public safety and security." The White House, *Securing Our Borders* (Jan. 20, 2025).

Accordingly, upon taking office, and pursuant to sections 201 and 301 of the National Emergencies Act (50 U.S.C. § 1601 *et seq.*), the President declared a national emergency at the Southern Border. The White House, *Declaring a National Emergency at the Southern Border of the United States* (Jan. 20, 2025). In his judgment, "the gravity and emergency of this present danger and imminent threat" make it "necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border." *Ibid.* The President has therefore ordered the Armed Forces to carry out a "mission to seal the borders and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities." *Ibid.*

3.      That mission has necessitated the extension of military installations and placement of military personnel along both sides of the Southern Border. The Government of Mexico has pledged to deploy 10,000 troops to the Border to target "illegal migration and drug and weapons trafficking." Lizbeth Diaz, *Mexican troops deployed to border as part of deal to pause US tariffs* (Feb. 5, 2025) https://www.reuters.com/world/americas/mexican-troops-deployed-border-part-deal-pause-us-tariffs-2025-02-04/. And the United States has initiated a parallel mobilization on the northern side.

To that end, on April 15, 2025, the Department of the Interior transferred over 109,651 acres of federal land along the Border—including the approximately 60-foot-wide Roosevelt Reservation in New Mexico—to the Department of Defense. *See* Public Land Order No. 7963. Three days later, the Secretary of the Army made these lands, now designated as the New Mexico National Defense Area (NMNDA), part of the Fort Huachuca U.S. Army installation. The same day, Fort Huachuca's

commander issued a security regulation designating the NMNDA as a restricted and controlled area under Army Regulation 190-13, which prohibits unauthorized entry onto such areas.

Establishment of the NMNDA was a critical step toward maximizing the effectiveness of the military presence at the Border. Although military personnel "have been working alongside Customs and Border Protection since January [2025] to seal the southern border," they had been confined to a support role—able to, *e.g.*, "assist in identifying border crossers" but not "apprehend them," as "only CBP personnel could" do the latter. C. Todd Lopez, *At Southern Border, Defense Secretary Visits Newly Created National Defense Area*, DOD News (Apr. 25, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4166835/at-southern-border-defense-secretary-visits-newly-created-national-defense-area/. Now, military personnel "can temporarily detain trespassers until an appropriate law enforcement entity can assume custody." *Ibid.* "Service members can now also," *inter alia*, "conduct cursory searches of trespassers to ensure the safety of U.S. service members … and provide emergency medical support to trespassers to prevent the loss of life, limb or eyesight." *Ibid.*

4.      The inclusion of the NMNDA within the Fort Huachuca installation also carried legal consequences for non-military personnel. Among other statutes enacted to protect the integrity of military property, Congress has made it a misdemeanor to "willfully violate[] any defense property security regulation," 50 U.S.C. § 797, such as the one designating the NMNDA as a restricted and controlled area under Army Regulation 190-13. And Congress has sought to safeguard against unlawful activity on military property by making it a misdemeanor to "go[] upon any military … installation, for any purpose prohibited by law or lawful regulation." 18 U.S.C. § 1382.

In enacting those provisions, Congress was attentive to the dangers posed by unauthorized access to military property—and, specifically, to the disruption that could result from unauthorized aliens trespassing on such property. For example, in the same National Defense Authorization Act that included Section 797, Congress also directed the Secretary of Defense to "submit to Congress a

report containing … an assessment of the impact on military readiness caused by undocumented immigrants whose entry into the United States involves trespassing upon operational ranges of the Department of Defense." Pub.L. 109-163, Div. A, Title III, § 354, 119 Stat. 3204. Congress thus anticipated scenarios in which an alien's "entry into the United States" and "trespass[] upon operational [military] ranges" coincided—the current situation in the NMNDA.

## STATEMENT OF THE CASE

1.      On May 4, 2025, Border Patrol encountered Dishoda Rozlkova in Dona Ana County, New Mexico. Complaint 2. Rozlkova was determined to be a citizen and national of Uzbekistan and illegally present in the United States. *Ibid.* The Border Patrol determined that Rozlkova had illegally crossed the boundary between the U.S. and Mexico on May 4, 2025, approximately 7 miles east of the Santa Teresa Port of Entry. *Ibid.* In so doing, she entered both the United States and the NMNDA without authorization. *Id.* at 2-3.

2.      On May 8, 2025, Rozlkova was charged by criminal complaint with one count each of entering into the United States without inspection, in violation of 8 U.S.C. § 1325(a)(1); willfully violating a defense property security regulation, in violation of 50 U.S.C. § 797(a)(1); and going upon a military installation for a purpose prohibited by law or lawful regulation, in violation of 18 U.S.C. § 1382. Complaint 1. The clerk's minutes for her first appearance in court reflect that she speaks Uzbeck and was unable to proceed in either English or Spanish.

3.      On May 19, 2025, the Honorable Gregory B. Wormuth, Chief United States Magistrate Judge, issued an order dismissing the charges under Sections 797 and 1382. *See* ECF No. 4. The Magistrate Judge assessed that "the factual allegations in the Criminal Complaint fail to establish probable cause on an essential element of [those statutes]"—specifically, the *mens rea* element, which (in the Magistrate Judge's view) required that Rozlkova not only have intruded on the military

installation while unlawfully entering the United States, but also "knew he/she was entering the NMNDA" as part of her effort to enter without inspection. *Id.* at 16.

## ARGUMENT

### I.    An Alien's Intent to Enter the United States Without Inspection Satisfies the Willfulness Standard of Section 797.

Section 797(a)(1) prescribes misdemeanor penalties for anyone who "willfully violates any defense property security regulation." This "willfulness requirement … does not carve out an exception to the traditional rule that ignorance of the law is no excuse." *Bryan v. United States*, 524 U.S. 184, 196 (1998). Rather, a defendant such as Rozlkova who enters the District of New Mexico from Mexico through an area that is not a designated port of entry—and knows that such conduct is unlawful because it constitutes an unlawful entry into the United States itself—has violated Section 797 by "willfully violat[ing]" the military regulation that prevents unauthorized NMNDA entries. To be convicted of "willfully violat[ing] [a] defense property security regulation" under these circumstances, the government must show:

(1)    The defendant knowingly and voluntarily entered the United States from Mexico through an area that is not a designated port of entry.

(2)    The defendant knew that, by entering the United States through an area that is not a designated port of entry, he or she was acting unlawfully.

(3)    When entering the United States from Mexico through an area that is not a designated port of entry, the defendant also entered upon the NMNDA military installation.

(4)    The NMNDA is regulated by a "defense property security regulation" that precludes unauthorized entry upon the NMNDA.

(5)    The defendant was not authorized to enter the NMNDA.

*See* 50 U.S.C. § 797(a)(1). Because the complaint adequately established probable cause as to each of those elements, the Magistrate Judge's order lacked foundation.

Specifically, the Magistrate Judge mistakenly extended the presumption of scienter—which has been used to distinguish culpable from innocent conduct in contexts where Congress's intent cannot otherwise be discerned—to immunize clearly (indeed, concededly) culpable conduct whenever a defendant lacks further regulatory knowledge immaterial to the culpability of his actions.  Although the Magistrate Judge correctly found that Rozlkova's conduct was undertaken for the illicit purpose of unlawfully entering the United States as required for willfulness, he erred by applying a scienter element found nowhere in the statute—requiring, above and beyond the culpable purpose, that the defendant knew she was entering regulatorily designated military territory (or possibly even *specifically the NMNDA*).  Order 8-11.  That conclusion contravenes both the text of Section 797 and the background legal principles against which it was enacted.

### A.    The Magistrate Judge Correctly Concluded That Section 797's Willfulness Element Does Not Require Knowledge of the Law.

We begin on common ground.  The Magistrate Judge correctly determined that the form of willfulness required under Section 797—"knowledge that the [defendant's] conduct is unlawful"—"can be sufficiently shown by [Rozlkova]'s simultaneous illegal entry into the United States."  Order 5-7.

1.    Generally, "[t]he term 'willfully' … [only] requires proof the defendant 'acted with knowledge that his conduct was unlawful.'"  *United States v. Benton*, 988 F.3d 1231, 1238 (10th Cir. 2021) (quoting *Bryan*, 524 U.S. at 193).  In such cases, "[t]he government need not show … that the defendant was aware of the particular statute he was violating."  *United States v. Joseph*, 530 F. App'x 911, 919 (11th Cir. 2013).  The government must show only that the defendant knew he or she was doing "*something* that was unlawful."  *United States v. Wyatt*, 964 F.3d 947, 958 (10th Cir. 2020) (emphasis added); *see also United States v. Adegboye*, 732 F.3d 1195, 1199 (10th Cir. 2013) (same).  "[I]n other words, a defendant 'cannot avoid prosecution by claiming that [he] had not brushed up on the law'" or the

"specific regulation governing the conduct engaged in." *United States v. Brodie*, 403 F.3d 123, 147-48 (3d Cir. 2005). "Rather, the government must prove only that the defendant[] knew that [his] planned conduct was legally prohibited and that [he] therefore acted with an evil-meaning mind." *Ibid.* Accordingly, "when used in the criminal context, a 'willful' act" follows "the traditional rule that ignorance of the law is no excuse." *Bryan*, 524 U.S. at 191-95.

"[A]n exception to [this] traditional rule" exists for "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan*, 524 U.S. at 194. For example, in "cases involving willful violations of the tax laws," the Supreme Court has required "the jury [to] find that the defendant was aware of the specific provision of the tax code that he was charged with violating." *Ibid.* (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991)). The same holds for "structuring of cash transactions to avoid a reporting requirement," which likewise subjects to liability "apparently innocent conduct." *Ibid.* (citing *Ratzlaf v. United States*, 510 U.S. 135, 138, 149 (1994)). But in all such cases, it is "[t]he danger of convicting individuals engaged in apparently innocent activity that motivated" the extension of *mens rea* beyond its traditional bounds. *Id.* at 195. Where no such risk is present because the defendant "knew that his conduct was unlawful," no such heightened *mens rea* attaches.

2.    The Magistrate Judge correctly assessed that "50 U.S.C. § 797 as applied here" requires the usual *Bryan* willfulness and is not "a statute which would fit within th[e] exception" for "'highly technical statutes.'" Order 5. A defendant who knows that he or she is acting unlawfully need not fully grasp every independent reason why his or her conduct is unlawful—*e.g.*, the existence or details of the "defense property security regulation" he or she is violating. The inapplicability of the rationale for the "'highly technical statute'" carveout—"the danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan*, 524 U.S. at 194—is particularly well illustrated by those, like Rozlkova, whose unlawful entry into the NMNDA was simultaneous to and in furtherance of their

unlawful entry into the United States without inspection. Such a violation of law cannot be deemed "apparently innocent."

Virtually all aliens who enter the District of New Mexico from Mexico through an area that is not a designated port of entry—and thereby enter the NMNDA restricted military area without authorization—are not "engaged in apparently innocent conduct" but are instead aware of the unlawfulness of that conduct. By definition, such individuals have "enter[ed] the United States at … [a] place … [not] designated by immigration officers." 8 U.S.C. § 1325(a)(1). Because such unauthorized entries are generally "undertaken with a 'bad purpose'"—namely, the purpose of violating the Nation's immigration laws and avoiding detection and interdiction by law enforcement— "[t]he danger of convicting individuals" under 50 U.S.C. § 797 for unauthorized NMNDA entries due to "apparently innocent conduct" is vanishingly low. *Bryan*, 524 U.S. at 194. The Magistrate Judge therefore appropriately construed Section 797 to require general *Bryan* willfulness rather than the heightened *Cheek/Ratzlaf* willfulness reserved for "'highly technical statutes,'" *see supra* pp. 12-13, and correctly recognized that the allegations in the complaint satisfied the former standard.

**B.    The Magistrate Judge Erroneously Engrafted an Atextual Scienter Element.**

The Magistrate Judge erred, however, in requiring an additional element of "knowledge that the defendant has entered the NMNDA." Order 10. That atextual scienter element disregards Congress's selection of a willfulness *mens rea* and effectively requires the technical regulatory knowledge deemed irrelevant for this category of offenses under *Bryan* and its progeny.

**1.    The Statutory Text Embodies No Scienter Requirement as to the Existence or Provenance of a Military Installation.**

"The mental state sufficient for commission of a federal criminal offense is a question of congressional intent," *Benton*, 988 F.3d at 1238, and "[t]he best evidence of congressional intent … is the statutory text that Congress enacted," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392 (2013).

Nowhere does Section 797 require that the defendant have "known" or received "actual notice" that he was on or entering military property. The statute requires only that the defendant have acted "willfully," which—as the Magistrate Judge correctly determined—the government may satisfy by showing his culpable purpose of entering the United States without inspection. *See supra* pp. 11-14.

In concluding otherwise, the Magistrate Judge appeared to reason—relying on *Bryan*—that Section 797's willfulness *mens rea* requires knowledge of all "the facts that constitute th[e] offense"; thus, because one of those facts is entry upon the NMNDA, *see supra* p. 10, the defendant must know he or she had entered the NMNDA. *See* Order 9-10. But that cannot be correct. The existence of the "defense property security regulation" is also among the facts constituting the offense, 50 U.S.C. § 797(a), and the Magistrate Judge recognized that knowledge of that regulation is unnecessary. *See* Order 5.

Indeed, *Bryan* itself rejects the Magistrate Judge's line of reasoning. There, one of the central facts constituting the defendant's offense was his lack of a federal firearms license. *See* 524 U.S. at 189; 18 U.S.C. § 922(a)(1)(A) (prohibiting anyone "except a licensed importer, licensed manufacturer, or licensed dealer" from dealing in firearms). The Supreme Court held, however, that the statute's willfulness *mens rea* did not require the defendant even to be aware of the federal licensing requirement; he only had to be aware that his conduct was unlawful more generally. *See Bryan*, 524 U.S. at 196; *see also id.* at 189 & n.8. Although Section 797's willfulness *mens rea* is more demanding than knowledge in the sense that it requires awareness of unlawfulness, it does not require knowledge of each factual component of the offense in the manner the Magistrate Judge supposed. *Cf., e.g., United States v. Evans*, 74 F.4th 597, 606-07 (4th Cir. 2023) (holding that a statute prohibiting "willfully and without authority, set[ting] on fire any timber, underbrush, or grass or other inflammable material" on federal land, 18 U.S.C. § 1855, does not require knowledge that the location of the fire is federal land).

By analogy, if a New Mexico statute prohibited "willfully entering New Mexico state property without authorization," and a defendant entered such property aware that he was trespassing, it would be no defense if he mistakenly thought he was in Arizona. Just as a defendant need not know the precise latitude and longitude of the statutory border line between the two States, he need not have specific knowledge of the Executive Order or other regulatory actions establishing the military status of the land that he trespassed upon for the purpose of illegally entering the United States.

> **2.    A Presumption of Scienter Is Likewise Inapposite Because the NMNDA's Status Is a Jurisdictional Element.**

The Magistrate Judge appeared to ground his analysis in part in the "presumption of scienter." Order 8. The Magistrate Judge acknowledged, however, that the presumption of scienter does not apply to "a statute's 'jurisdictional elements.'" Order 8. And he recognized that certain legal characteristics of the area onto which Rozlkova trespassed—that it was "military property with a security regulation"—were "the jurisdictional prerequisites of the crime." *Id.* at 5. But he nevertheless extended the presumption of scienter to those "jurisdictional prerequisites," at least to the extent that the government must prove Rozlkova's "knowledge that [she] has entered the NMNDA." *Id.* at 10. Because the legal status of Rozlkova's entry point as a National Defense Area is jurisdictional, however, any scienter element would not reach that fact. *See Torres* v. *Lynch*, 578 U.S. 452, 468 (2016) ("[W]hen Congress has said nothing about the mental state pertaining to a jurisdictional element, … [c]ourts assume that Congress wanted such an element to stand outside the otherwise applicable *mens rea* requirement.").

In that sense, this case is similar to *United States v. Feola*, 420 U.S. 671 (1975), in which the Supreme Court held that the federal statute penalizing assault on a federal officer, 18 U.S.C. § 111, "cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer," *Feola*, 420 U.S. at 684. There, as here, Congress enacted the relevant

provision "to protect both federal officers and federal functions" and to "provid[e] a federal forum" for vindicating those interests. *Id.* at 679, 682. There, as here, liability depended in part on the special governmental status (there, a "federal officer," *id.* at 684; here, a "military property with a security regulation," Order 5) carried by the object of the offense. And there, the Supreme Court deemed that special status "jurisdictional" and held that "knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction." *Feola*, 420 at 676, 697; *see also id.* at 694 ("[I]mposition of a requirement of knowledge of those facts that serve only to establish federal jurisdiction would render it more difficult to serve the policy behind the law … without serving any other apparent social policy.").

This case is like *Feola* in another respect as well: Regardless of his knowledge of any jurisdictional fact, the defendant could be found guilty only if he acted with a culpable purpose. Just like Rozlkova, the defendant in *Feola* was engaged in unambiguously culpable conduct (there, assault; here, unlawful entry into the United States) but nevertheless sought to evade criminal liability on the basis of his asserted ignorance as to the special-status element. And there, the Court explained that its "interpretation poses no risk of unfairness to defendants" and "is no snare for the unsuspecting" because

> [a]lthough the perpetrator … may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.

*Id.* at 685. So too here: Although Rozlkova "may [have] be[en] surprised to find" that she had illegally crossed into military rather than civilian territory, she knew "from the very outset that h[er] planned course of conduct [wa]s wrongful." In deliberately entering the United States outside of a port of

entry established for that purpose, Rozlkova must "take[] h[er] [destination] as [s]he finds [it]" and face the consequences of her "willful[]" conduct.

> **3.** **Because the Willfulness Element Already Distinguishes Innocent from Culpable Conduct, No Presumption of Scienter Is Warranted.**

In any event, a *presumption* is just that—an assumption about general practice contingent on certain facts and rebuttable by contrary indicia. Here, Congress's explicit choice of "willful[ness]" in Section 797 overrides any implicit scienter element a court might otherwise be inclined to infer. *See supra* pp. 14-15.

Moreover, as the Supreme Court has instructed, the presumption of scienter operates only insofar as necessary "to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize *otherwise innocent conduct*.'" *Rehaif v. United States*, 588 U.S. 225, 229 (2019) (emphasis added). Additional knowledge—*i.e.*, about the full contours of and legal rationale for his offense—is not necessary for a defendant who both acts unlawfully and does so "willfully," or for a "bad purpose." *Bryan*, 524 U.S. at 194. When she entered the country without authorization or inspection, Rozlkova was not engaged in "otherwise innocent conduct," *Rehaif*, 588 U.S. at 229—nor, by definition, would any other defendant who has engaged in a "willful[]" violation of law.

The Magistrate Judge correctly determined that Rozlkova's "intent to illegally enter the United States can satisfy the 'willfully' requirement that Defendant knew that [her] conduct was unlawful under 50 U.S.C. § 797." But he erroneously concluded that a presumed scienter element as to the status of the NMNDA was necessary to shield this *willfully culpable* defendant from liability for "otherwise innocent conduct." Order 9. Imposing an additional scienter element here fails to serve the interest that undergirds the scienter presumption: ensuring that apparently innocent conduct by unwary persons is not subjected to unforeseeable criminal consequences.

In all events, Rozlkova's (correct) understanding that she had entered an area where she was not authorized to be present satisfies scienter even without her separate subjective appreciation of each *reason* for which her presence was unauthorized.  Just as the defendant in *Liparota v. United States*, 471 U.S. 419 (1985), was liable for food-stamp fraud—notwithstanding his asserted ignorance as to the specific underlying regulations—because he knew, as a general matter, that his conduct "was unauthorized," *id.* at 434, Rozlkova is liable for violating Section 797—notwithstanding her asserted ignorance as to the relevant "defense property security regulation"—because she knew that his conduct was unauthorized.[2]  The Magistrate Judge's contrary determination cannot be squared with this foundational principle of *mens rea* jurisprudence.

## II.    Entering the United States Without Inspection Is a "Purpose Prohibited by Law" That Satisfies Section 1382's Specific-Intent Standard.

Section 1382 prescribes misdemeanor penalties for, *inter alia*, "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation."  The Magistrate Judge correctly determined that a defendant such as Rozlkova who enters the NMNDA from Mexico *for the prohibited purpose* of entering the United States without inspection has violated the plain text of this provision.  Order 11-12.  But the Magistrate Judge again proceeded to engraft an atextual scienter element onto the "military" status of the site.  *Id.* at 12-15.  For largely the same reasons already discussed in the context of his faulty Section 797 analysis, the Magistrate Judge erred

---

[2] The Magistrate Judge also placed undue emphasis (Order 10) on the separate requirement in Section 797(b)—distinct from the "misdemeanor violation" set forth in Section 797(a)—that the "regulation … be posted in conspicuous and appropriate places."  As noted *supra* pp. 14-15, the statute does not impose any precondition of actual or constructive notice before criminal liability may attach.  Moreover, aliens who enter the District of New Mexico from Mexico outside of a port of entry do not need a sign to tell them that they are doing "something that [is] unlawful."  *Wyatt*, 964 F.3d at 958.  And even assuming that such aliens had taken the time to read and understand the government's postings, their principal "bad purpose," *Bryan*, 524 U.S. at 191—entering the country unlawfully—would be unchanged.  In short, Congress did not add an additional *mens rea* requirement to the offense set forth in subsection (a) through the roundabout means of subsection (b)'s separate posting provision.

in disregarding Congress's choices, presuming a scienter requirement more stringent than the one that Congress prescribed where none was necessary to distinguish innocent from culpable conduct, and applying this atextual scienter requirement to a jurisdictional element.

> **A.    The Magistrate Judge Correctly Determined That the Government Need Not Prove Intent to Trespass on Military Property Where, As Here, the Defendant Acted for an Independent Unlawful Purpose.**

As a threshold matter, the Magistrate Judge correctly determined that "the Complaint establishes probable cause to believe that [Rozlkova]'s entry and presence in the NMNDA was for [the] unlawful purpose" of "illegally entering the United States" and "elud[ing] any examination." Order 12.

A defendant violates the relevant paragraph of Section 1382 when he or she "goes upon" military land—restricted or not—for "*any* purpose" that is unlawful.  18 U.S.C. § 1382 (emphasis added).  This would include, of course, some purposes that might have a specific military connection, such as interfering with the military's operation.  But it would also reach other prohibited purposes that are not limited to military installations, such as trafficking contraband or concealing evidence.  *See generally Alaska Dep't of Env't Conservation* v. *E.P.A.*, 540 U.S. 461, 484 (2004) (recognizing that "any" is a "notably capacious term[]").  When a defendant has such intent to commit an independent crime, he or she will have a "purpose prohibited by law or lawful regulation," regardless of his or her knowledge of the land's status.

In some cases, a defendant "goes upon" a military base without authorization without a purpose to commit a crime thereafter.  In such cases, the only potential "purpose prohibited by law or lawful regulation" would be the unlawful entry itself, and the government would need to show that the defendant knew he was entering a restricted military zone.  As the First Circuit has explained, "when a section 1382 prosecution proceeds on the basis that the defendant has entered a restricted military reservation 'for the purpose of' unauthorized entry, we think it must be shown that the

defendant had knowledge or notice that such entry was, in fact, prohibited." *United States v. Parrilla Bonilla*, 648 F.2d 1373, 1377 (1st Cir. 1981); *see also, e.g., United States v. Floyd*, 477 F.2d 217, 224 (10th Cir. 1973) ("The important fact is that the regulation prohibited entry to certain persons.  It becomes a matter of proof as to whether the Defendants were such persons and intended to enter the base knowing that they were so prohibited."); *United States v. Hall*, 742 F.2d 1153, 1154-55 (9th Cir. 1984) ("The prohibited purpose may be the unauthorized entry itself … Thus, going upon a military base with knowledge that such entry is unauthorized violates the statute.").  Without such knowledge, a defendant is not acting "for a purpose prohibited by law or lawful regulation," 18 U.S.C. § 1382—he is just innocently traveling onto military land with no culpable mindset.  *See United States v. Cottier*, 759 F.2d 760, 762 (9th Cir. 1985) ("The importance of this knowledge arises in that only innocent trespassers are excluded from purview of 18 U.S.C. § 1382.").

Here, the Magistrate Judge correctly determined that Rozlkova's case does not involve a charge where unauthorized entry into a military installation is itself the unlawful purpose with which the defendant is alleged to have acted.  *See* Order 11-12.  Instead, as alleged in the complaint, Rozlkova "entered the NMNDA in the process of illegally entering the United States at a place quite distant from the nearest Port of Entry" and did so "intending to elude [the] examination" required by law. *Id.* at 11.  That is a purpose "prohibited by law" separate and apart from the regulation prohibiting Rozlkova's entry into the NMNDA military installation.

### B.    The Magistrate Judge Incorrectly Engrafted an Atextual Scienter Requirement as to Restricted Military Status on Top of the Specific Intent Already Required by Section 1382.

The inquiry should have stopped there.  As was the case with the Magistrate Judge's Section 797 analysis, however, the Magistrate Judge went further and applied "the presumption of scienter" to the "going upon the military property" element.  Order 13.  That was error.

Like Section 797's requirement of "willful[]" conduct, Section 1382's express intent standard already "separate[s] wrongful conduct from 'otherwise innocent conduct.'" *Elonis*, 575 U.S. at 736. Simply put, no one who "goes upon a[] military … installation[] for a[] purpose prohibited by law," 18 U.S.C. § 1382, can claim that he was engaged in "otherwise innocent conduct." And in cases where the "purpose prohibited by law" is a further crime that does not itself depend on the military status of the land, the military status of the site serves only to confer federal jurisdiction; it does not create the "wrongful[ness]" of the defendant's conduct. *See Feola*, 420 U.S. at 691 (distinguishing government's burden in cases where "the underlying offense involved an act clearly wrongful in itself" from cases where "the acts agreed to were wrongful solely because of statutory proscription").

The Magistrate Judge nonetheless adopted an additional knowledge-of-land-status element, on the theory that doing so was necessary to avoid a purported "absurdity." Specifically, the Magistrate Judge posited a motorist "driving along … a road [that passes through a military base] intending to commit a crime in the next town" and suggested that such a person "would be guilty of a 18 U.S.C. § 1382 crime by the government's logic … even if they never committed the crime when they arrived at the next town and thus had never engaged in any knowingly culpable conduct." Order 14. The Magistrate Judge could not abide "[t]he absurdity of such a result." *Ibid.*

That reasoning is unsound. There is nothing "absurd" about imposing liability on someone who undertakes an action—even a preliminary or inchoate one—"for a[] purpose prohibited by law." *Cf. United States v. Bindues*, 741 F. Supp. 3d 967, 1015 (D.N.M. 2024) ("The conclusion that a person groomed his victim simply is a conclusion that the accused possessed a certain wrongful mens rea, *i.e.*, that the accused engaged in overt or inchoate criminal conduct."). And it is not necessary for this Court to definitively determine that Section 1382 reaches all persons who—knowingly or not—merely *traverse* a military installation *en route* to a future crime. The word "for" in Section 1382 could connote an instrumental rather than incidental relationship between the defendant's entry upon the installation

19

and his unlawful purpose.  Therefore, the statute could be read to require a nexus between the "go[ing] upon" and "purpose" elements that could limit its scope to, for example, defendants whose criminal purposes will be accomplished on the installation.  But that reading encompasses defendants like Rozlkova, so this case does not implicate the Magistrate Judge's feared absurdity.  Nor does it suggest the government could necessarily prosecute someone for merely "step[ping] on land he does not know is part of [a] base … without having any culpable intent," Order 15; an unlawful purpose is necessary under Section 1382.

## III.    Other Factors Would Not Justify a Heightened *Mens Rea* Here.

Although the Magistrate Judge did not reach the remaining arguments advanced by the Office of the Federal Public Defender in its briefing[3] on these issues, those arguments provide no justification for a heightened *mens rea* requirement

### A.    The Defendant Was Not Engaged in Socially Desirable Behavior.

As discussed at length above, the interest served by the presumption of scienter is in shielding apparently innocent conduct from unforeseeable liability.  But for obvious reasons, courts have been particularly insistent on a robust *mens rea* requirement when the *actus reus* is constitutionally protected or otherwise socially beneficial conduct.  For example, the Supreme Court has conscientiously enforced the presumption of scienter in cases implicating the right of law-abiding Americans to keep and bear arms under the Second Amendment.  *See Rehaif*, 588 U.S. at 232; *Staples*, 511 U.S. at 611-12. And it has likewise sought to ensure that an overly lax *mens rea* standard does not chill "socially beneficial conduct" such as the ordinary and professional practice of medicine.  *Ruan v. United States*,

---

[3] *See generally In the Matter of Misdemeanor Charges Pursuant to 50 U.S.C. § 797 and 18 U.S.C. § 1382*, No. 2:25-mc-00019, Dkt. No. 5 (D.N.M. May 8, 2025) ("FPD Br.").

597 U.S. 450, 459 (2022); *see also id.* at 464 (highlighting "the crucial role authorization (or lack thereof) plays in distinguishing morally blameworthy conduct from socially necessary conduct"); *id.* at 474 (Alito, J., concurring in the judgment) ("There are hints in the Court's opinion that it has crafted a special rule for doctors—for example, the Court describes their conduct in writing prescriptions as not just 'innocent,' but 'socially beneficial' and 'socially necessary.'").

By specifying the requisite states of mind for Sections 797 (limited to those who act "willfully") and 1382 (limited to those who undertake a "purpose prohibited by law"), Congress has ensured that liability will not attach to innocent, protected, or beneficent conduct. And whatever else might be said about it, Rozlkova's behavior—crossing the Border in attempted evasion of law enforcement and deliberate contravention of the Nation's immigration laws—is neither constitutionally protected nor socially desirable. To the contrary, it is plainly culpable conduct to which no presumption of scienter—much less a judicially heightened one—should apply.

**B.    The Offenses at Issue Are Part of a Regulatory Program That Carries Only Minor Penalties.**

The Supreme Court has found that "severe penalties counsel in favor of a strong scienter requirement." *Ruan*, 597 U.S. at 460; *see also, e.g.*, *Staples*, 511 U.S. at 618-19 (noting that "a severe penalty is a further factor tending to suggest that … the usual presumption that a defendant must know the facts that make his conduct illegal should apply"). The converse is also true: The Court "ha[s] typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a 'regulatory' or 'public welfare' program and carry only minor penalties." *Rehaif*, 588 U.S. at 232. The Court has described that class as including offenses that simply "create the danger or probability of [injury] which the law seeks to minimize," *Morissette v. United States*, 342 U.S. 246, 256 (1952), and carry "relatively small" penalties in comparison to offenses that single out serious wrongdoers, *ibid.* Because Sections 797 and 1382 are misdemeanor offenses that contemplate

maximum custodial sentences of one year and six months, respectively, they fall within the bucket of "minor penalt[y]" provisions that do not warrant judicial imposition of a heightened *mens rea* standard.

The context of the instant case reinforces that conclusion. In light of the "extensive and complex" federal regulatory regime governing "immigration and alien status," *Arizona v. United States*, 567 U.S. 387, 395 (2012), a person crossing the United States' international borders "should be alerted to the probability of strict regulation," *Staples*, 511 U.S. at 607. In such reticulated regulatory regimes, the Supreme Court has assumed that "Congress intended to place the burden on the defendant to 'ascertain at his peril whether his conduct comes within the inhibition of the statute.'" *Ibid.* Rozlkova therefore cannot evade responsibility for her willful lawbreaking by pleading ignorance as to the particular provisions she violated.

### C.    No Grievous Ambiguity Justifies Resort to the Rule of Lenity.

Because Congress's drafting choices in these two statutes are evident and should be respected, there is no role for lenity in this case. *Cf.* FPD Br. 14-15. Going back half a century, the Supreme Court has consistently explained that "'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended.'" *United States v. Castleman*, 572 U.S. 157, 172-73 (2014) (citation omitted); *see Huddleston v. United States*, 415 U.S. 814, 831 (1974). That demanding formulation ensures that unelected judges respect "the product of the legislative process" and refrain from applying a substantive canon that could alter a statute's meaning unless the statute is truly and irremediably ambiguous. *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 123 (2010). And it is not satisfied here, as both Sections 797 and 1382 speak directly to the state of mind required for conviction.

In any event, neither of the dual purposes served by the rule of lenity—"ensur[ing] both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define

criminal liability," *Crandon v. United States*, 494 U.S. 152, 158 (1990)—would be advanced by applying that rule here. A defendant who acts "willfully" and "for a[] purpose prohibited by law" cannot complain that he lacked "fair warning" that his conduct has exposed him to criminal liability. *See Feola*, 420 U.S. at 685 ("It is no snare for the unsuspecting" where the defendant "knows from the very outset that his planned course of conduct is unlawful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected."). And respecting Congress's selection of a specific *mens rea*—rather than judicially imposing scienter elements found nowhere in the enacted text—best ensures that the "legislature[], not courts, define[s] criminal liability" under these provisions.

### D. There Is Nothing Unusual or Improper About the Same or Related Conduct Giving Rise to Multiple Statutory Violations.

The Federal Public Defender asserts (FPD Br. 16 n.8) that "[t]he Government's charging theory that one act, stepping across an international boundary line, supplies the necessary *mens rea* and any applicable knowledge requirements for three separate criminal statutes implicates double jeopardy." That contention appears to sound in the defunct "same-conduct" rule, under which double-jeopardy principles were understood to "bar[] a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Grady v. Corbin*, 495 U.S. 508, 510 (1990), *overruled by United States v. Dixon*, 509 U.S. 688 (1993).

Under the Double Jeopardy Clause, no person "shall … be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Clause protects against, *inter alia*, "multiple criminal punishments for the same offense." *Monge v. California*, 524 U.S. 721, 727-28 (1998). But under current Supreme Court precedent, the Clause does not protect defendants from successive prosecutions for related but distinct offenses based on the same conduct. Indeed, it is immaterial

whether a second criminal charge is based on the same or closely related conduct as the first so long as the charged offenses have distinct elements. *See Gamble v. United States*, 587 U.S. 678, 710 (2019) (noting the "long-settled rule that an 'offence' for double jeopardy purposes is defined by statutory elements, not by what might be described in a looser sense as a unit of criminal conduct").

Accordingly, the Supreme Court has rejected "[t]he 'same-conduct' rule" as "wholly inconsistent with … Supreme Court precedent and with the clear common-law understanding of double jeopardy." *Dixon*, 509 U.S. at 704. Thus, even assuming *arguendo* that the same *mens rea* sufficed for all three statutes, prosecution under all three would be constitutional, within executive discretion, and unremarkable.

### E. The Legislative-Intent Analysis Must Take Stock of the Compelling Governmental Interest in Safeguarding Military Installations.

Finally, the importance of the government's interest should bear on the Court's analysis of this "question of congressional intent." *Benton*, 988 F.3d at 1238. Both provisions at issue aim to safeguard the territorial integrity and operational capacity of the Armed Forces. Courts have recognized that the government may dispense with *mens rea* entirely when doing so is necessary to safeguard such vital national-security interests. *See, e.g.*, *Fed. Express Corp. v. Dep't of Commerce*, 486 F. Supp. 3d 69, 76 (D.D.C. 2020) (upholding strict-liability regime intended to "advance 'national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States'"), *aff'd*, 39 F.4th 756 (D.C. Cir. 2022).

Of course, the statutes here do not go that far: To establish liability under these provisions, the government must allege and prove that Rozlkova acted "willfully," 50 U.S.C. § 797(a)(1), and "for a[] purpose prohibited by law," 18 U.S.C. § 1382. Going beyond those enacted standards and "requir[ing] technical knowledge of the law," *United States v. Johnson*, 981 F.3d 1171, 1182 (11th Cir. 2020), however, would inhibit effective enforcement of these statutes—both in the context of the

current crisis at the Southern Border and in the innumerable circumstances in which the safety of the Nation requires secure and undisturbed military installations. *Cf. Feola*, 420 U.S. at 678 ("If the primary purpose is to protect federal law enforcement personnel, that purpose could well be frustrated by the imposition of a strict scienter requirement.").

## CONCLUSION

For the foregoing reasons, this Court should overrule the Magistrate Judge's order and reinstate the dismissed charges.

Respectfully submitted,

RYAN ELLISON
*United States Attorney*
*District of New Mexico*

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record.

*/s/*
RYAN ELLISON
United States Attorney